All right, we're going to shift from firearms to ERISA, so Mr. Shah, take it away. Thank you, Your Honor. May it please the Court, Pratik Shah for the Defendant Appellant Plan. Plaintiff Michael Cloud, who last played in the NFL during the 2005-2006 season, has received total and permanent disability benefits from the plan since he first applied for those benefits in 2014. At that time, he was awarded inactive A, total and permanent disability benefits, amounting to $135,000 per year, but denied active football benefits, that's the highest, very highest level but most restrictive category, on the ground that he hadn't become totally and permanently disabled shortly after the October 2004 triggering event. Critically, plaintiff never appealed that 2014 determination. Instead, in 2016, he filed a new application for a, quote, reclassification to active football benefits, which gave rise to this case. After the initial review committee denied reclassification, the board, half of which are former players appointed by the Employee Representative NFL Players Association, denied the appeal for three independent reasons, each amply supported by more than substantial evidence. One, that plaintiff's administrative appeal was untimely. Two, that plaintiff didn't satisfy the special gatekeeping requirement for changed circumstances under reclassification. And three, plaintiff still couldn't satisfy active footballs shortly after requirement. The district court not only vacated that denial, but granted outright reclassification to active football benefits. This court should reverse on all the grounds set forth in our briefing, but here today I'd like to focus on two in particular, either of which supports the plan's denial fully. First, as a threshold matter, the board properly determined that plaintiff's administrative appeal was untimely, a determination backed by overwhelming record evidence. That should be the end of this case. Let me ask you, if the court holds that the plan did abuse its discretion in handling Mr. Cloud's claim, can you still weigh in on the timeliness argument? These are not linked at all? Yes, Your Honor. These are independent grounds. So if he missed the appeal deadline, and I'm happy to walk through the evidence he did, then there is no appeal, right? There is no appeal, just like if someone missed a notice of appeal deadline, even if there was some error, you wouldn't get there. And on the timeliness issue in particular, are you arguing that the district court went beyond the administrative record to that claim? It did, but even if you accept all the factual findings of the district court, which did go beyond the record, I'm willing to accept the district court's findings on timeliness. There's three key pieces of evidence on timeliness that I'd like to walk you through. First is unrefuted evidence, and the district court finds this, the plan sent board and committee decisions by FedEx signature delivery. That's district court's finding, paragraph 67, that's at 12-566, supported by the record. Everyone agrees with that. They sent these decisions by FedEx signature delivery. Fact two, undisputed, unsigned packages and decisions were returned to the plan office. That's also at paragraph 67 of the district court's decision, also undisputed in the record. Point number three, the FedEx record in the administrative record, which was downloaded and maintained in the regular course of business by the plan, showed, quote, proof of delivery recipient as M. Clouck, C-L-O-U-C, on March 4th. Was the spreadsheet with the FedEx data, was that in the administrative record at the time of denial? Yes, Your Honor, that's at, uh, it's at page, uh, the record is 695. That's the administrative record page, and it shows a spreadsheet, it prints out a little bit funny, but it shows the FedEx data as they downloaded contemporaneously at the time. If you take those pieces of evidence together, that they sent these plan decisions by signature delivery, it wasn't returned to the plan office, which means it was signed for, and it was C-L-O-U-C, obviously a typo, then it is certainly reasonable, and obviously overwhelmingly correct for the plan to assume that Mr. Cloude received it on March 4th, which would make his appeal filing 182 days, while the plan says you have to file within 180 days. It's as simple as that. The only response that plaintiffs give, which to its credit, it doesn't atop the district court's reasoning, which is that M. Cloude, that might be someone else, the plan had to verify that. Um, instead, plaintiffs say, oh no, there was a stipulation that it had actually been received two days later. The context, as we lay out in our reply brief at 4 through 6, if you read that portion of the transcript, 13-7-51 to 54, there was no stipulation on the receipt date. The only stipulation was plaintiff's position, so that he didn't have to testify at trial, was that he received it on March 6th, and that was to reconcile it with his inconsistent deposition testimony, which said he couldn't recall when he received it, and then he filed an errata that said, oh, actually I recall receiving it on March 6th, exactly 180 days before, in conflict with all of the evidence that I already recited. Not even the district court relies on that purported stipulation. So that is the overwhelming evidence in the record. Under any standard of review, Your Honors, this appeal was untimely. The board decision found that as an independent basis, and that should be the end of the case. Now, if that were not enough, I want to talk about the merits, because it is crystal clear, again, under any standard of review, that Mr. Cloude was not, he was totally permanently disabled, the plan had been paying those benefits since 2014. What he was not entitled to was the very highest level of total and permanent disability benefits, which is called active football. He filed a, he did not appeal his denial in 2014, when he was granted total and permanent disability benefits at the inactive A level. He did not appeal that determination and say, no, I should have been, and he was denied active football. He didn't appeal that determination. Instead, he filed two years later, an application for reclassification. By design, the ERISA plan has a much higher standard of burden, when, proof, when you're doing reclassification, for obvious reasons. You were supposed to appeal if you disagreed with the determination in the first place. That reclassification application, this is undisputed as well, has to satisfy a change circumstances is a two-step test that the claimant must meet by clear and convincing evidence. The first step is that he actually shows change circumstances in that intervening period, between 2014 and 2016. For example, a new or different condition. Here, plaintiff never even alleged change circumstances in his application to the board. To the contrary, he requests waiver of that requirement and asked to treat this as a first-time initial application. That's at record page 660. That is in his appeal letter. He says, can you please waive that requirement and treat this as an initial application, not a reclassification application? That means he did not present the argument at all under Gomez. It's forfeited. But there's a good reason he asked for waiver, is because he can't satisfy that requirement. On the merits, if you compare the 2014 submission he made to the plan with the 2016 submission he made to the plan, and it's only a few pages each. I'll cite you the record pages so you can look at them. The 2014 application is 264 to 267 of the record. The 2016 application is 456 to 459. What plaintiff in the district court says, oh, in 2016, for the first time, he listed affective disorder. But that wasn't listed in 2014. The problem is, in black and white, if you turn to page 267 of the record, in his 2014 application, in the cover letter, no less, he says, quote, Mr. Cloud has been awarded a fully favorable SSI decision with an onset date of December 31, 2008, as a result of severe impairments of migraine headaches and affective mental disorder. So the district court and plaintiffs are just wrong that he didn't put that condition in the 2014 application. It can't be a changed circumstance. If you line up those two applications side by side, they list the same conditions. It's there in black and white. If we hold, hypothetically, that the board was right to deny reclassification based on the lack of changed circumstances, do we need to address any other issues like shortly after or untimeliness or the lack of a full and fair review? No, Your Honor. You don't need to address any issue if you either decide this on timeliness or on changed circumstances or on shortly after. If you decided on any one of those three grounds, you don't have to reach any other ground. And that's because this court's case law is clear, and we cite it. Does that include the argument that there was no full and fair review? Yes, Your Honor. And in particular, I'd point you to the cases cited on page 21 of our reply brief, which says, if it's clear that he's ineligible for the benefit, then a procedural remand for full and fair review would be a, quote, useless formality. That's LeFleur footnote 22, the Clark case, which says remand would be a useless formality where, quote, no amount of review can change the fact that plaintiff is ineligible for the benefits. That's on page 22 of our reply brief. And that makes sense, of course. No matter how much process he gets, even if he thinks the board members have to review each and every one of these thousands of pages of these thousands of applications they get, even if they think that the board members themselves, the former players, have to write the words of the actual decision, all of that, none of that would change the fact that the appeal was untimely, that he didn't satisfy changed circumstances, black and white, under however you construe changed circumstances, just look at the record pages that I cited you, nor would it change the fact that he can't satisfy, and this in some ways is actually the easiest one, shortly after requirement. Any one of those three does it, because he has to show, under the reclassification standard, and this is at the record 205, which has the reclassification rule under the plan, that he became totally and permanently disabled shortly after his October 2004 injury, that is within a year, because of the changed circumstances. That's the language. Because of the changed circumstances. It is a logical impossibility, your honors, for a change in condition from 2014 to 2016 to show that you became totally and permanently disabled by 2005. Unless you had a time machine, it just can't happen. You can't say that a change in circumstance for 2014 to 2016 made me totally and permanently disabled by the end of 2005. There's a mountain of evidence, obviously, that he wasn't totally and permanently disabled as of the end of 2005. He was playing in NFL games, and you don't have to trust me, you can take the words of his own counsel, which we cite in our brief, it's at page 14040 of the record. It says, Mr. Cloud, he said, Mr. Cloud has not said that he was totally and permanently disabled with the hit on October 31, 2004. That was the triggering event. He worked for the New York Giants in his last stint through March 30, 2006, obviously more than a year later. You cannot be totally and permanently disabled and play in the NFL. That's the words of their counsel. Obviously it's correct. You can't be an NFL running back playing in games and be totally and permanently disabled, and you certainly can't be totally and permanently disabled while being a running back in the NFL when your change in conditions happened after 2014, and when the SSA, the Social Security and Disability Application, found that the onset, based on his own allegation, was the end of 2008. All of that is conclusive. The only argument they have left is the special rules argument. That was never raised before the board at any time. It is forfeited three times over. It wasn't raised in the 2014 application. It wasn't raised in the 2016 application. In fact, he checked the, and that's at record 459, he checked the not applicable box to special rules, represented by counsel, by the way, nor was it raised in the appeal to the board, and this is at record 660, when he lays out his argument for shortly after. He says, I satisfied shortly after. He never mentions the special rules. He never says shortly after didn't apply to him. It's clear that that special rules provision, even if you somehow got beyond forfeiture, and this is about the clearest case of forfeiture that you'll ever see in an ERISA case, and in ERISA, of course, Gomez, this court's decision in Gomez, has provided a particularly strong forfeiture rule given the purposes of ERISA exhaustion, but even if you got beyond all of that and got to the merits, the summary plan description of this provision, of the special rules provision from 2005, this is not a made for litigation position by the board. Summary plan description, which provides guidance, which was sent to Mr. Cloud. This is in our reply brief quoted in full at pages 19 and 20 with the record sites, says that the special, that all of the requirements of active football still apply under the special  You can read it there. Mr. Shaw, you've got five minutes left on rebuttal. Thank you, Your Honors. We'll get back to you. Mr. Denny, we'll hear from you. May it please the court, Christian Denny on behalf of Michael Cloud, appellee and plaintiff. I'm setting the stage for this argument. It's important to note that this is an appeal from a thorough 84-page, 200-plus fact-based decision from the district court. The district court did all the hard work. The district court dug through the record. It evaluated evidence. It set forth a very thorough opinion analyzing all of these issues. Now, we heard something that was important just a few moments ago. The plan is accepting the court's findings. They have not argued there was clear error on any of the things that just occurred. They said, we accept the findings of the court, hence why they probably did not even address the standard here. But this case is one that's of vital importance. What the plan is asking this court to do is throw away the two weeks of trial, throw away their strategic decision to offer witnesses who confirm what the district court found, throw away the X-file that they did not produce until three days before the discovery period where all the information laying out what the court rendered in addition to the testimony, throw all that out and give us absolute and blind discretion. If that occurs, every plan in the United States will cite this decision to hold up a decision by a plan where they admit they did not review the record, they have post hoc decisions, they have people doing things and overseeing things without the board even knowing who they are and just committing error after error after error. They admitted to six violations of their own plan in this case. That will have an absolute chilling effect on every single beneficiary of an ERISA plan in this country. Counsel, in the end, don't we have to decide, change circumstances as that term is used between 2014 and the 2016? Change circumstance is obviously an issue that the trial court addressed in detail that they have not really challenged. There are eight different definitions of change circumstance and the thing I think that's very important is look at Robert Smith's testimony. Robert Smith, still a board member, was a board member at the time. He said three things that were vitally important on that very point. Number one, he said, there is no definition of change circumstances. Number two, he said, it's evolving. Number three, he said, our attorneys that have to defend us come up with what that means. In this case, they did not challenge the finding of the court that there was evidence of a change circumstance in a new report. In addition to that, counsel said, look at things side by side. The board members who testified live at trial testified they did not review side by side the 2014. Well, aside from definitional uncertainty, which you just highlighted, what did you argue on behalf of Mr. Cloud to be a change circumstance? Where can we find that in the record? Yeah, the change circumstances comes from there's an additional report that was not previously provided in the 2014 application. In addition to that, he put two different additional standards in his application addressing that issue. I'm trying to find the quote real quick, but he said, significant memory loss and attention problems and also affective disorder. Now, counsel's have these new reports since 2014 where he went to be evaluated by a medical doctor or some other type of medical professional that showed in snapshot fashion, well, here's what he was like in 2014 and he has now degenerated in whatever fashion prior to filing the request in 2016. Yeah, so there's a series of documentation that frankly goes all the way back to 2010 where the 20, because he's only seen a neurologist appointed by the plan one time in 2010. And that doctor said he has traumatic brain injury back in 2010. Now, the evolution, there were various medical reports and doctors along the way that are in the record that we've provided and addressed in detail. Again, they didn't challenge that for clear error and the court found that there was a change circumstances by that additional evidence. One key point that I just wanted to bring up that was missed, the affective disorder issue is a little bit of a medical challenge of sorts. The trial judge used one piece of information from Dr. Wu who was the plaintiff's expert and it was on page 34, note 15 and what she was, what she used that for is under the Crosby Vega exception for completeness of the record was to show that affective disorder included paranoia and delusion, which was a new thing for Michael Cloud. That would not appear to any previous record. As we sit here today, there's no dispute, Michael Cloud is totally and permanently disabled. He's totally and permanently disabled from playing in the NFL. Now counsel has this argument that they're trying to fashion on the special rules. The special rules, that is really important because you have to look at the language and how this court interprets the word subject to. This court has interpreted the word subject to to mean modifying certain language. It doesn't say in addition to, it says subject to and the subject to in this case is very simple. Do you have a psychological disorder? Everyone agrees yes. Did it occur from head injuries? Every person in this case, yes. And then finally, is that a total and permanent disability? Everyone agrees yes. Occurring from league activities, yes. He meets the special rules. Now counsel just made this argument that nowhere does it show in the application in 2016 any reason to apply 5.4B of the plan. As we've discussed in great detail at trial, as the court found, which has not been challenged, he states multiple times, cumulative mental disorders through the 2005 season. The 2005 season for the New York Giants, the team he played for, concluded on January 8, 2006. The NFL league year concludes March 30, 2006. So those are some of the reasons for those dates. This is 100% right in the paperwork. Cumulative mental disorder, mental incapacity, all of those things are there in addition to all of the medical circumstances and situations, which the board members testified they didn't even know what they meant, yet they still, despite the plan requiring an order to a medical physician to determine what happened, did not make that order. That's in 12.6 of the plan. They're just violation after violation. But one of the things I think that's really important here is the plan tries to argue that we just had a rogue judge that had it out for us. That is not the case. This is a history. This is a problem for these players who are, frankly, this era did not know what they were getting into. It wasn't until 2009 that the concussion stuff came out. So Michael Cloud did not know that these head injuries would take the toll that it did. But what have courts around the country been saying for years? You're not reviewing the record. Same thing here. Not providing reasonable interpretations of the plan. Same thing here. Failure to explain the reasons for denial. Same thing here. Abusive discretion. Now, who has made those calls? The Fourth Circuit, the Eighth Circuit, the Ninth Circuit, the Eleventh Circuit, and district courts all around the country. This is not a rogue judge. This is a judge who did her job. Let me ask you a quick question about the standard of review. Do you agree that we owe deference to the plan's interpretation of the plan provisions? So two points on that, Your Honor. So first is, going back to something I briefly mentioned, was there were strategic decisions made. The strategic decisions made by the plan were to offer witnesses live at trial. Michael Cloud did not. He relied exclusively on the record. The plan brought in three witnesses. Those witnesses crippled their case. Trial court can't ignore what she heard. She can't ignore the evidence that's contrary to everything they've said. So that's one. Number two, court can't ignore egregious errors that she's listening to live at trial. Can't ignore that. So that would go to first, again, this court has said time and time again, clear error on factual disputes. And everything they've come up here and argued is all just factual. Talking about deference, do we owe deference to how the NFL, how the plan interprets the plan's language? Correct. So yeah, that was my point two, and I'll jump to that. Thank you. So point two is, this case could have clearly been a de novo review under Corkerite. Because of all the errors, the court did apply a discretionary abuse of discretion standard. It's very detailed in her order. Now this court has said time and time again, Judge Englehart said in an opinion when you were on the district court bench in 2007 discussing the sliding scale. There's a sliding scale of deference. And when you see this egregious error over and over again, admissions that you don't know who is reviewing the records, admissions that the decision to deny Cloud's case was actually made before the board members even knew there was a case. All of these things go to a sliding scale of very little deference to be applied to the plan. Let me jump back to Judge Englehart's question about changed circumstances. You do agree that changed circumstances are a necessary part of a reclassification? Yeah, 5.7 does require a changed circumstance. And we have the evidence and the evidence supported that there was. That's my follow up. And I know you had a back and forth with Judge Englehart about this. But step me through again the evidence of changed circumstances between the 2014 application and the 2016 application. What's your best argument on that score? Sure. So there was additional evidence. There was additional medical reports that were not previously provided. Now that was an omission from the records that the plans paralegal provided. But there was additional evidence. His ex-wife testified he, quote, flipped the switch. There was medical evidence showing that those conditions he was having were exacerbating. Now Dr. Wu testified to paranoia and delusion. You don't see that in any other place in the record. Pardon me for interrupting. I want to hear the rest of your answer to Judge Willard's question. But when we say was not previously provided, were these in existence prior to the 2014 time period and they were not previously provided or were they generated based upon examinations after the 2014 application? So there, yeah, it's a two-part answer to that. The affective disorder is referenced briefly in the Social Security report. That's there. Now affective disorder is a very broad explanation and the board members testify they had no clue what it was. But you have things, everything from light depression to, on the far end, paranoia and delusion. So he had the depression aspect, some anxiety aspect. That had occurred earlier. But the paranoia and delusion did come later during the time frame you're referencing. So have I answered your question, Judge Willard? Okay, thank you. So I want to hit, if I could, finish up on the standard of review a little bit. The standard of review, even in a discretionary view, is very fact-based. And in this case, the court went in great detail over the facts. I believe there are 212 findings of fact, factual findings in this case. And this court has said, for the two-step approach, one of the major components of that is a combination of fact, method of review. So you're looking at all the facts. You're addressing all these facts. You don't have to do that. They are asking you to basically come in and re-review the facts. That's not the standard. It's clear error after a bench trial. This court has said that many times. Judge Willard, you've said that many times on bench trials relating to denial of benefits. It's a clear review standard, clear error standard, I should say. So when you look at this scenario and you look at, we have to balance all these facts, that's already been done. And they haven't even been challenged. So those facts are the facts of this case. And I point out, Judge Oldham, your concurring opinion in 2021 in Michael v. Blue Cross, the standards apply here, but it's not connected to the law and logic, is what you said in that concurring opinion. These standards, remember, go back to ERISA, which is in the light most favorable to the plan beneficiary, solely in the best interest of the beneficiary. ERISA was drafted not to protect the plan, but to protect Michael Cloud and other beneficiaries. When we're looking at the standard, you have the ability to slide that scale down to give a little deference. And when you see all these errors, all the errors that have been addressed, that leads to very, very low deference. And again, the trial court can't ignore what these people, their witnesses, are testifying live at trial. So I want to address the 180 days issue. And quite to my surprise, that's their best argument, according to them. 180 days is a red herring. It is a farce. They, again, agree with the findings of fact issued by the trial court. But now they're asking you to determine differently, although they just said here in front of you, we agree with what was said. So I want to address a couple of things. And every witness in this case concluded the same way on this language. The language from the letter, dated March 2, 2016, from, they call themselves the DIC, but the Disability Initial Claims Committee, says, you may appeal the committee's decision to the Plans Retirement Board by filing a written request for review with the Retirement Board at this office within 180 days of your receipt of this letter. Every one of their witnesses testified that that meant the day he actually picked it up. Now the stipulation, counsel kind of manipulated what the stipulation was a bit. This was a stipulation requested by the plan. Frankly, I've never had anyone in any trial request such a stipulation. I was kind of shocked as to why they were requesting a stipulation on the date of receipt. But what the stipulation was that Michael Cloud stipulates, he picked up the letter from his doorstep on March 6, 2016. That is timely. There is a stipulation on that. Mr. Meehan, who's sitting over here, the trial counsel, said, we agree to that. That was the stipulation. There wasn't some stipulation as counsel that I just decided to offer. That was requested by them, and we agreed. Isn't that the reason, though, that they used the, obviously, FedEx signature, so on, so that there's a confirmation date, it would seem to defeat the whole purpose if a recipient could simply say, well, I got it on Saturday, but I didn't open it until Monday, or somebody at my house signed for it on Saturday, but, you know, I opened it on Wednesday. So I'm trying to reconcile the hard physical evidence of a FedEx delivery with what your client's claiming is the date. You can also look at the, when you look, you can look at the entire record under the right for any reason rule. Mr. Cloud's ex-wife, who was deposed by the plan, their request, because they engaged in a lot of discovery, despite claiming, apparently, that discovery was unnecessary. She testified that they would often just leave FedEx packages without signature. So the evidence here, and again, this is not disputed here. Clear error. They have not shown clear error. The district court said there was not enough. In this case, the corporate representative, Sam Vincent, testified it was just his assumption that that's when it was delivered. So that's not enough. That assumption is not enough to carry that date. But the most important aspect of the 180 days argument is the court's analysis in addressing the post hoc decision. This was admittedly by both Robert Smith and Dick Cass, the two board members they called to testify and strategically made that decision. They both testified we did not look at that issue. We did not address that issue. This was a decision made by a paralegal who did not attend the meeting. If you look at the board minutes, does not reference anything as to untimeliness. But there's an email from Sam Vincent, who's the corporate representative of the plan, sending to the paralegal from the groom law firm that says the reason for denial is changed circumstances. Nothing else. That's it. So there's a case out of the Ninth Circuit that says it better than I can probably say it myself. Samoa versus Honda long-term disability. Failing to pay out money owed based on a false statement of reasons for denying as cheating every bit as much as making a false claim. These are post hoc reasons. This board did not make that decision. This was made by a paralegal in darkness. This had nothing to do with a decision rendered by the board. That whole argument needs to be thrown out. It is not the decision of the board. The board did not review the decision before it went out. There was no such decision on 180 days. That is my time. Thank you very much. Mr. Denny, thank you very much. All right, Mr. Shaw, you've got five minutes on rebuttal. Let me kind of begin where Mr. Denny left off. What's your best argument that the plan authorized the board to essentially delegate its review of the administrative record to advisors, to the groom, law? There is unrefuted board testimony that the way this plan is set up is the board delegates to advisors to work with them to review the record, to draft the opinions. This is on page 36 and 37 of our brief. It's laid out at the record at 101, 52, 13, 633, 34. That's how this plan works. What is the provision that provides that authority, that delegation? Sure. I would point you to record 217, and this is from the plan itself. This is provision 8.2f of the plan. It says, quote, the board has delegated the power, quote, delegates its power and duties to other persons and appoint and assign authority to other persons as it, including but not limited to accountants, investment managers, counsel, actuaries, record keepers, appraisers, consultants, professional plan administrators, physicians, other specialists, as it deems necessary or desirable in connection with the administration of the plan with the retirement board to the extent not prohibited by applicable law, being entitled to rely conclusively upon and being fully protected in acting or in declining to act in good faith reliance upon the advice or opinion of such persons. So it is explicit authority in the plan. They can't cite a single ERISA statutory provision, a single ERISA procedural regulation, a single ERISA case that says plans can't do this. This is a common provision in ERISA plans because you can imagine, as the American Benefits Council amicus points out, it would ground ERISA plan administration to a halt. These boards get thousands of applications each year. Of course they have to delegate record review, opinion drafting, all of those things. That's done with the imprimatur of the board. This is not a case where the board eschewed the decision and said, oh, there's some rogue paralegal here. They expressly embraced the decision. They said, this is our process. And the fact that the best evidence they have is they say the meeting minutes from the official board vote didn't lay out all of these reasons. Well, of course a one-line entry of meeting minutes isn't going to articulate the full rationales. That's what the opinion was for. That's especially true in the plan situation here, where there are pre-meetings before the official vote between each set of board members, the player side board members and the league side board members, each meet in pre-meetings with their advisors to discuss the reasons more fully. That is, there are no meeting minutes of those. That's not part of the administrative record. What we do know is that is the process. And then, as in every plan decision, the advisors then go and write the opinions based on this discussion. You can't, it would, in every ERISA case, then you would have a challenge that says, oh, well, the full board decision doesn't map, they would get discovery on meeting minutes and check meeting minutes, which are a shorthand description and say, oh, well, not all of the reasons are contained in there. It just doesn't make any sense. There is no procedural regulation that requires it. This court has said over and over again, we're not going to add procedural regulations. I'd like to just address two points in my remaining one minute. First, Judge Willard, you asked about the standard of review. This court's case law is clear under George. This court sits in the same position as the district court when reviewing a discretionary plan decision. And here, the plan fully commits discretion to the plan. And even the district court, as counsel admitted on page 80, applied that abuse of discretion standard. It says, quote, in the conclusion, the first sentence, in reviewing the board's decision pursuant to the framework set forth by the Fifth Circuit, the court has concluded that the board abused its discretion and arrived at a determination not supported by substantial evidence in the administrative record. Now, we think, obviously, for all the reasons that the district court misapplied that standard, paid lip service to it, but that is the standard of review under George. You apply that same standard. You review the board's decision for abuse of discretion and substantial evidence. But whatever the standard of review, Your Honor, you don't have changed circumstances here. You guys ask, point blank, what is your best evidence? He said, new medical record. That new medical record is a 2012 report, a report from 2012 by Dr. Cronin. How can a report from 2012 show same circumstances between 2014 and 2016? It cannot. That should be the end of this case. Shaw, thank you. Thank you, Your Honor. Thanks to the counsel for both sides. The case is submitted.